IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

FILED
IN OPEN COURT

NOV - 1 2023

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No. 1:23-CR-162 (RDA) |
| | ) | |
| v. | ) | Count 1: 18 U.S.C. § 371 (Conspiracy) |
| | ) | |
| JUAN CARLOS AREVALO III, | ) | Forfeiture Notice |
| | ) | |
| Defendant. | ) | |

## INFORMATION

THE UNITED STATES CHARGES THAT:

### GENERAL ALLEGATIONS

At times material to this information:

1.      Defendant JUAN CARLOS AREVALO III ("AREVALO") was a high-level government contractor with the U.S. Air Force ("USAF").  From in or about late 2013 to in or about late 2019, AREVALO served as the USAF's chief technologies officer and senior technical consultant for Headquarters Air Force, A2, Intelligence, Surveillance, and Reconnaissance Innovation ("HAF/A2I"), Deputy Chief of Staff for ISR (subsequently referred to as Q Group, Air Force Warfighting Integration Capability ("AFWIC"), Deputy Chief of Staff for Strategy, Integration and Requirement).  AREVALO worked primarily in the Pentagon, in the Eastern District of Virginia, and was responsible for working closely with senior USAF officials and helping to design, develop, and deliver various technologies to the USAF. AREVALO was a "public official" within the meaning of 18 U.S.C. § 201(a).

2.      JULIO SOTOMAYOR (a/k/a "JACE SOTOMAYOR") was a retired colonel with the USAF.  Between in or about 2008 and in or about 2010, SOTOMAYOR worked at HAF/A2.

SOTOMAYOR thereafter created two independent consulting firms, EAGLE MARKET

GROUP ("EMG") and FEDERAL SECURITY AGENCY ("FSA"), which he owned and

operated as sole proprietorships in Alexandria, Virginia within the Eastern District of Virginia.

SOTOMAYOR held himself out as a "Senior Advisor / Executive Consultant (IC)."

    3.      Person A was AREVALO's relative.

    4.      Broadcasting Board of Governors ("BBG") was an independent federal agency

that oversaw public service media networks, including Voice of America. The BBG changed its

name to the U.S. Agency for Global Media ("USAGM") in or about August 2018.

    5.      DIANE D. STURGIS was a BBG contract specialist and contracting officer.

STURGIS was a "public official" within the meaning of 18 U.S.C. § 201(a)(1).

    6.      PERSON B was the owner, president, and sole director of COMPANY B, a

government contractor located in the Eastern District of Virginia. In or about June 2013,

PERSON B retained SOTOMAYOR and EMG to provide strategic consulting and project

management services for COMPANY B. On or about January 20, 2014, PERSON B transferred

COMPANY B stock to SOTOMAYOR and made him a minority owner of COMPANY B.

    7.      COMPANY B provided staffing, IT solutions, data management, and analytical

services to federal agencies, including the BBG. COMPANY B received several contracts,

agreements, and task / purchase orders from the BBG that were awarded, supervised, and

administered by STURGIS, including a blanket purchase agreement for professional and

administrative staffing supplies and services that STURGIS awarded in or about late 2013.

    8.      Beginning in or about late 2013, the USAF, AREVALO, SOTOMAYOR,

PERSON B, and COMPANY B sought to find a contract vehicle to provide supplies and services

to HAF/A2I's Innovation Initiatives, which included programs and projects subsequently called "Acid," "Dewey," "Smart Node Pod," and "Special Projects." SOTOMAYOR, PERSON B, and AREVALO initially sought to use a preexisting supply schedule that COMPANY B had with the General Services Administration ("GSA"). In or about mid to late 2014, SOTOMAYOR, PERSON B, and AREVALO subsequently focused instead on using COMPANY B's blanket purchase agreement with the BBG as the contracting vehicle.

9. On or about September 25, 2014, with AREVALO's input and assistance, STURGIS and the BBG used COMPANY B's blanket purchase agreement to issue a purchase order for supplies or services (Contract No. BBG50-A-14-0040/0100 (later renumbered as BBG50-A-14-A-0040/0100)) and execute a series of military interdepartmental purchase request ("MIPR") agreements with the USAF (collectively, the "BBG/USAF contract"). The purchase order, modifications, and MIPRs were used by the USAF to procure approximately $51.6 million in services and supplies from COMPANY B between in or about September 2014 and in or about early 2020.

10. SOTOMAYOR, EMG, and FSA provided consulting and subcontractor services to COMPANY B, including services related to the BBG/USAF contract for which SOTOMAYOR received approximately $5.9 million through October 2020. Among other things, SOTOMAYOR served as a liaison between the USAF, COMPANY B and PERSON B, and the BBG and STURGIS. SOTOMAYOR communicated frequently with both AREVALO and STURGIS in the Eastern District of Virginia and elsewhere.

3

## COUNT 1
### (Conspiracy)

11.     The allegations set forth in paragraphs 1-10 are realleged and incorporated by reference as though fully set forth herein.

12.     Beginning no later than in or about late 2013, and continuing until at least in or about October 2019, in the Eastern District of Virginia and elsewhere, the defendant, JUAN CARLOS AREVALO III, SOTOMAYOR, and others known and unknown, did knowingly and unlawfully combine, conspire, confederate, and agree together and with each other:

        a.     To engage in bribery, that is, to directly and indirectly, knowingly and corruptly seek, receive, accept, and agree to receive and accept anything of value personally and for any other person or entity, in return for being influenced in the performance of any official act, in violation of 18 U.S.C. § 201(b)(2); and

        b.     To devise and intend to devise a scheme and artifice to defraud and deprive the USAF and the citizens of the United States of their intangible right to the honest services of AREVALO, a high-level USAF contractor, through bribery, and to cause wire communications to be transmitted in interstate commerce for the purpose of executing such scheme, in violation of 18 U.S.C. §§ 1343 and 1346.

### Manner and Means of the Conspiracy

The conspiracy was carried out through the following manner and means, among others:

13.     SOTOMAYOR and AREVALO agreed to engage in a corrupt scheme in which SOTOMAYOR, through EMG, paid approximately $185,000 to AREVALO using his relative, Person A, as a pass-through intermediary.  In exchange for these payments, AREVALO agreed to perform, and did perform, official acts—and advised other officials, knowing and intending

4

such advice to form the basis for official acts—benefitting SOTOMAYOR, COMPANY B, and PERSON B regarding the awarding, modifying, administering, and supervising of the BBG/USAF contract.   Also in exchange for these payments, AREVALO was placed on retainer and agreed to perform, and did perform, official acts—and advised other officials, knowing and intending such advice to form the basis for official acts—on an as-needed basis for SOTOMAYOR, COMPANY B, and PERSON B, as opportunities arose.

14.     In or about late 2013, at or near the time when SOTOMAYOR, PERSON B, and COMPANY B were seeking a contract vehicle to obtain contract awards associated with HAF/A2I's technology initiative and associated projects, SOTOMAYOR and AREVALO discussed giving money to AREVALO and using a pass-through mechanism to disguise the payments.   SOTOMAYOR and AREVALO agreed to provide money to AREVALO by hiring his relative, Person A, and paying the money to Person A purportedly for consulting work relating to health insurance.

15.     Between in or about late 2013 and in or about October 2019, SOTOMAYOR periodically met and conferred with AREVALO at the Pentagon and other locations in the Eastern District of Virginia and elsewhere regarding the scheme.   During certain meetings, SOTOMAYOR gave AREVALO checks in envelopes issued by SOTOMAYOR and EMG for Person A despite the fact that Person A did not provide any consulting work for EMG.

16.     After receiving the EMG checks from SOTOMAYOR, AREVALO provided the checks to Person A.   Person A deposited or cashed the checks and used the funds for the benefit of AREVALO and Person A.   SOTOMAYOR and EMG thereafter issued IRS Forms 1099-Misc to Person A to make the purported consulting work appear legitimate.

## Purpose of the Conspiracy

17.     The purpose of the conspiracy was: (a) to use AREVALO's position as a high-level USAF contractor to benefit and enrich SOTOMAYOR, PERSON B, COMPANY B, AREVALO, and Person A through bribery; (b) to defraud the USAF and citizens of the United States and deprive them of their intangible right to the honest services of AREVALO, a high-level USAF contractor, through bribery; and (c) to conceal the nature and purpose of the scheme.

## Overt Acts

In furtherance of the conspiracy and to effect its objects, AREVALO, SOTOMAYOR, and others committed the following overt acts, among others, in the Eastern District of Virginia and elsewhere:

18.     In or about late 2013, AREVALO and SOTOMAYOR discussed the fact that HAF/A2I was seeking a contract vehicle to fund a series of technology projects.  SOTOMAYOR and PERSON B were interested obtaining this contract work for COMPANY B.  AREVALO, SOTOMAYOR, and PERSON B first attempted to use COMPANY B's GSA Schedule and a pre-existing relationship that the USAF·had with the Naval Postgraduate School ("NPS") as the contract vehicle.

19.     In or about late 2013, AREVALO and SOTOMAYOR discussed and agreed that SOTOMAYOR would make payments to AREVALO using Person A as a pass-through intermediary.

20.     On or about October 28, 2013, PERSON B sent an e-mail to SOTOMAYOR, asking him to review draft documents, including COMPANY B's unsolicited proposal to HAF/A2I, a limited sources justification and approval form (which would allow the contract to

6

be sole sourced to a small business in lieu of a competitive bidding process), and the resumes of two contractors for the project.

21.     On or about October 29, 2013, SOTOMAYOR forwarded the e-mail to AREVALO's personal e-mail account, stating: "JuanCo. Raw data. FYI. Plz. look over for content and substance. Keep between us. On here ur Gmail. Cheers."

22.     On or about October 30, 2013, after AREVALO reviewed the material sent by SOTOMAYOR, AREVALO, using his personal e-mail account, sent a reply e-mail to SOTOMAYOR stating: "[L]ooks great send up to [the USAF project supervisor]."

23.     On or about October 30, 2013, SOTOMAYOR sent an e-mail to AREVALO's personal e-mail account, attaching a revised copy of COMPANY B's unsolicited proposal and attachments. The e-mail stated, "JuanCo Plz look over, comment. . . . if all good . . . it will be sent in tomorrow a.m.."

24.     On or about October 30, 2013, after AREVALO reviewed COMPANY B's revised, unsolicited proposal, AREVALO sent a reply e-mail to SOTOMAYOR indicating that COMPANY B could increase their rates to accommodate another contractor.

25.     On or about November 1, 2013, after PERSON B submitted COMPANY B's proposal to AREVALO and the USAF project supervisor, PERSON B and AREVALO coordinated with each other regarding revisions. PERSON B then resubmitted the proposal to the USAF project supervisor and, subsequently, forwarded the e-mail chain to SOTOMAYOR.

26.     On or about November 1, 2013, AREVALO, using his government e-mail account, sent an e-mail to PERSON B (copying SOTOMAYOR, the USAF project supervisor, and others and attaching a signed copy of the limited sources justification and approval form).

AREVALO's e-mail stated: "I had to get the document signed by our SES [HAF/A2I director]. Here is the document. I talked to [the USAF project supervisor] about the borrowing of hours from DISA [Defense Information Systems Agency] and [the USAF project supervisor] is good with it. That way we can get our guys working right away."

27. On or about November 2, 2013, SOTOMAYOR sent an e-mail to AREVALO's personal e-mail account with instructions on how to complete the contract process with NPS and GSA using a MIPR and with a reminder to communicate through AREVALO's personal e-mail account. SOTOMAYOR's e-mail to AREVALO attached the limited sources justification and approval form and an internal government cost estimate ("IGCE"). SOTOMAYOR's e-mail stated in part:

> - IGCE, you have here - HOWEVER, DO NOT, email anything out that you get from me or [PERSON B].(outside of the unsolicited proposal).. print and scan , then use your scan copy in your email.
>
> - SOW - you have the original , I will try to draft up a more specific one that you can adjust, - worst case , go with what you have
>
> - 8a award letter - You have it with [HAF/A2I director's] signature - THIS is the winner... directed action.. The copy you sent needs to be fixed a little --- First page needs to be scanned and then page two added to it.. reason is , page one has draft, sample on it... we need the actual., but the signature is golden .. Might want to add his signature block if possible .
>
> - Send those above to gsa [GSA official and email address]

28. On or about November 2, 2013, SOTOMAYOR sent a follow-up e-mail to PERSON B and AREVALO's personal e-mail account, reminding them to e-mail "offline" and attaching a "cleaned up" version of the limited sources justification and approval form

8

(previously signed by the HAF/A2I director) and the IGCE. PERSON B sent a reply e-mail in which PERSON B, among other things, asked for AREVALO's cellular telephone number "in case there's a need to connect up."

29.     On or about November 4, 2013, AREVALO, using his government e-mail account, sent an e-mail to PERSON B informing PERSON B that AREVALO had spoken with NPS and COMPANY B's GSA Schedule would not be a viable option. AREVALO then asked PERSON B whether COMPANY B had business partners that could re-submit the proposal as a prime contractor and, if not, AREVALO's office had some prime contractors that might be able to serve in this capacity.

30.     Between in or about November 5, 2013, and in or about November 7, 2013, SOTOMAYOR and AREVALO exchanged a series of e-mails in which SOTOMAYOR first reminded AREVALO that he was using AREVALO's personal e-mail account. Among other things, SOTOMAYOR and AREVALO discussed different ways to structure the USAF contract vehicle, including using DISA and other vendors to serve as the prime contractor (including a company with which SOTOMAYOR had a large financial relationship). SOTOMAYOR added that if they chose the company he was affiliated with, HAF/A2I could not know about the identity of the prime contractor: "[N]o one in office can know they are prime. If all can be handled directly with NPS. Then we can claim DISA is adding to their existing [NPS] work. ?" SOTOMAYOR also provided instructions and talking points to AREVALO, including contacting GSA, pressuring GSA officials to expedite the process, and informing them that HAF/A2I's director had approved the request.

9

31.     In or about early to mid-November 2013, AREVALO, SOTOMAYOR, and PERSON B exchanged several e-mails.  The e-mails reflect that AREVALO was willing to get HAF/A2I's director to sign off on various contract structures; PERSON B drafted an e-mail for AREVALO so that AREVALO could then send it to NPS on behalf of the USAF; and AREVALO was communicating with a deputy director in HAF/A2I regarding the contract negotiations.

32.     On or about January 1, 2014, after SOTOMAYOR and EMG issued the first check to Person A, AREVALO, using his person e-mail account, forwarded an e-mail to SOTOMAYOR that attached Person A's W-9 tax form.

33.     In or about early 2014, AREVALO, SOTOMAYOR, and, on occasion, PERSON B, continued to communicate with each other, including regarding AREVALO's efforts to obtain the contract vehicle with NPS.

34.     In or about March 2014, AREVALO, using his personal e-mail account, received and edited COMPANY B's revised statement of work and the resume of one of COMPANY B's proposed contractors.

35.     In or about September 2014, after negotiations involving NPS had stalled and PERSON B introduced SOTOMAYOR to STURGIS, SOTOMAYOR, PERSON B, and STURGIS discussed using COMPANY B's blanket purchase agreement with the BBG to fund the BBG/USAF contract.  SOTOMAYOR also began communicating with AREVALO regarding the same strategy.

36.     On or about September 18, 2014, SOTOMAYOR sent an e-mail to AREVALO's personal e-mail account attaching the statement of work for the BBG/USAF contract.

10

37.     On or about September 25, 2014, after both AREVALO and STURGIS had

extensive communications with SOTOMAYOR, PERSON B, and BBG and USAF officials

regarding funding, MIPR coordination, and other contract processes for the BBG/USAF contract,

STURGIS signed an initial purchase order for supplies and services to COMPANY B totaling

approximately $11 million that was issued pursuant to COMPANY B's blanket purchase

agreement.

38.     Between in or about September 2014 and in or about October 2019, AREVALO,

SOTOMAYOR, and PERSON B periodically communicated regarding technical assistance,

funding issues, and contract processes for the BBG/USAF contract.  AREVALO worked closely

with COMPANY B's staff during contract performance periods.  SOTOMAYOR and

AREVALO also traveled for work-related matters and, on occasion, AREVALO would discuss

contract opportunities.

39.     On or about the dates listed below, SOTOMAYOR issued EMG checks made

payable to Person A and provided the checks to AREVALO in envelopes.  AREVALO provide

the checks to Person A, who then deposited and/or cashed the checks for the benefit of

AREVALO and Person A.

| Post Date | Check # | Check Date | Payee | Check Amount | Memo/Note Description |
|---|---|---|---|---|---|
| 01/27/2014 | 1648 | 12/26/2013 | Person A | $5,000.00 | Consultant fee |
| 04/28/2014 | 1698 | 04/25/2014 | Person A | $5,000.00 | Consultant Fee 1099/ (illegible) Med/(illegible) |
| 11/14/2014 | 1784 | 11/01/2014 | Person A | $10,000.00 | Consultg Fee - Sept. Oct 14 |
| 12/22/2014 | 1803 | 12/15/2014 | Person A | $10,000.00 | Prof Svcs - Invoice Nov. Dec 14 |
| 04/27/2015 | 1843 | 04/01/2015 | Person A | $10,000.00 | Prof Con Svc. Inv FEB/MAR 15 |
| 05/27/2015 | 1865 | 05/22/2015 | Person A | $5,000.00 | Conslt Svc Fee/Inv 004 Apr 15 |
| 06/29/2015 | 1879 | 06/22/2015 | Person A | $5,000.00 | Prof Con Svc - MAY 15 - INV 05 |
| 11/25/2015 | 1901 | 08/23/2015 | Person A | $5,000.00 | Conslt Svc - Jun Inv# 006 |
| 11/25/2015 | 1994 | 09/27/2015 | Person A | $10,000.00 | Prf Conslt Svc. Jul/Aug 008 |

11

| | | | | | |
|---|---|---|---|---|---|
| 03/01/2016 | 2043 | 02/15/2016 | Person A | $5,000.00 | Conslt Svcs  Prof Svc.  Jan 16 |
| 07/13/2016 | 2094 | 06/20/2016 | Person A | $5,000.00 | Inv 16-2 Apr 16 |
| 08/04/2016 | 2105 | 08/04/2016 | Person A | $5,000.00 | Conslt Svc  Inv Jul 16 |
| 12/02/2016 | 2138 | 11/17/2016 | Person A | $5,000.00 | OCT Conslt Svcs |
| 12/09/2016 | 2143 | 12/05/2016 | Person A | $10,000.00 | Conslt Svcs - Inv Sept/Nov |
| 12/27/2016 | 2146 | 12/21/2016 | Person A | $5,000.00 | Inv# DEC 16 |
| 04/19/2017 | 2182 | 04/04/2017 | Person A | $5,000.00 | Constg Svcs - Feb Inv L-1701. |
| 06/30/2017 | 2198 | 05/16/2017 | Person A | $5,000.00 | Conslt Svc - INV 1702 EMG APR |
| 10/05/2017 | 2247 | 09/30/2017 | Person A | $5,000.00 | Inv  Cnsllt  Spt 1703 |
| 11/02/2017 | 2251 | 10/30/2017 | Person A | $5,000.00 | Prof Cnst Svc  INV # 0704 |
| 12/15/2017 | 2267 | 12/12/2017 | Person A | $5,000.00 | INV  1705   DEC 17 |
| 04/02/2018 | 2290 | 03/09/2018 | Person A | $5,000.00 | Cnst Spt Inv. |
| 08/28/2018 | 2321 | 08/15/2018 | Person A | $10,000.00 | Conslt Svcs Inv# 1802 |
| 10/04/2018 | 2331 | 10/01/2018 | Person A | $5,000.00 | Cnslt Spt Svc. |
| 11/19/2018 | 2343 | 10/31/2018 | Person A | $5,000.00 | Conslt Svc - InV - L18-04 |
| 12/03/2018 | 2350 | 11/30/2018 | Person A | $5,000.00 | INV L-18-06  Cnst Spt |
| 03/15/2019 | 2366 | 01/30/2019 | Person A | $5,000.00 | Prf Spt – Cnsltg |
| 04/22/2019 | 2381 | 04/15/2019 | Person A | $5,000.00 | Cnst Svc Inv |
| 06/17/2019 | 2394 | 06/11/2019 | Person A | $5,000.00 | Cnst Spt Svc Inv # L-19-03 |
| 08/15/2019 | 2367 | 06/30/2019 | Person A | $5,000.00 | Prof Spt INV II |
| 09/27/2019 | 2419 | 09/26/2019 | Person A | $5,000.00 | CNSLT Spt |
| 10/24/2019 | 2431 | 10/23/2019 | Person A | $5,000.00 | Cnslt Invoice |
| **Total** | | | | **$185,000.00** | |

## Forfeiture Notice

40.     Pursuant to Federal Rule of Criminal Procedure 32.2, the defendant is hereby
notified that upon conviction of the offense charged in Count 1 of this Criminal Information, he
shall forfeit to the United States any property, real or personal, which constitutes or is derived
from proceeds traceable to the offense charged in Count 1. The United States may also seek an
order forfeiting substitute assets if the proceeds of the offenses are not available.

(In accordance with 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

12

Respectfully submitted,

Jessica D. Aber
United States Attorney

Corey R. Amundson
Chief, Public Integrity Section
U.S. Department of Justice

By: _Edward P. Sullivan_____

Edward P. Sullivan
Special Assistant United States Attorney (LT)
Senior Litigation Counsel, Public Integrity Section
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel:  703-299-3700
Edward.P.Sullivan@usdoj.gov

13