**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | \| |
| | \| |
| **v.** | \|          **1:23-cr-00162-RDA** |
| | \| |
| **JUAN CARLOS AREVALO, III,** | \| |
| | \| |
| **Defendant.** | \| |

<u>**DEFENDANT'S POSITION ON SENTENCING**</u>

Mr. Arevalo has gone to great lengths to accept responsibility in this case. When the Government asked him to agree to a statute of limitations tolling agreement, Mr. Arevalo did so. When the Government offered Mr. Arevalo a reasonable plea offer, he accepted it. After he was transferred from the state custody in Prince William County to federal custody via a writ of habeas corpus ad prosequendum, Mr. Arevalo immediately appeared before this Court and pleaded guilty in this matter. He agreed to waive his right to an indictment so the Government would not have to prepare materials for the grand jury. And because of the complicated, jurisdictional custody issue in which he finds himself, Mr. Arevalo agreed to accommodate the Government's request for an extremely truncated time to prepare for sentencing. He has done these things so the Court knows, when he says he regrets his actions and he is remorseful, that Mr. Arevalo is extremely serious.

Abraham Lincoln once wrote, "I have found that mercy bears richer fruit than strict justice." Mr. Arevalo is a case for mercy. Although he conspired to commit bribery, the impact of his crime, the actual harm, is minimal. And as the Court will see, Mr.

Arevalo's positive contributions to the Department of Defense and the Air Force are life-changing for our military, our law enforcement officers across the nation, and our first responders.  His invention, the Android Tactical Assault Kit (ATAK),[1] will probably save countless lives.  There are a variety of reasons, discussed below, to sentence Mr. Arevalo to a term of probation, or alternatively to run any period of incarceration concurrent with his anticipated state sentence pursuant to 18 U.S.C. § 3584(a) and USSG 5G1.3(d).

## BACKGROUND

On October 18, 2023, this Court issued a writ for Mr. Arevalo, who was in state custody.  On November 1, 2023, he appeared in this Court, waived his right to indictment, and pleaded guilty to one count of conspiracy in violation of 18 U.S.C. § 371.  The Government requested a sentencing date in early or mid-December because Mr. Arevalo was in state custody (primary) and needed to be returned to Prince William County.  Mr. Arevalo consented and the Court granted the Government's request.  Mr. Arevalo appears in this Court for sentencing on December 13, 2023.

## CORRECTIONS & OBJECTION TO THE SENTENCING GUIDELINES

### *Corrections*

The Office of Probation was able to meet the condensed timeline for sentencing, but without the normal process for issuing corrections.  Mr. Arevalo will include his corrections here for the Court.  On page 3, Mr. Arevalo's origin should be corrected to "Asian or Filipino."  On page 18, the first sentence of paragraph 94 should be amended

---

[1] The technology has different names depending on the agency that uses it, e.g., domestic law enforcement calls it the Android Team Awareness Kit to remove the combat connotation.

to add "and ruptured his L5 vertebrae." The second sentence of paragraph 94 should be corrected to state that Mr. Arevalo "does experience back pain" after many months in jail. Finally, on page 18, paragraph 95 should be amended to add that Mr. Arevalo also takes "vitamin D and heart medication."

*Objection*

Mr. Arevalo objects to the Office of Probation's addition of 2 points for concluding this offense involved more than one bribe. PSR ¶ 64; *see* USSG 2C1.1(b)(1) ("If the offense involved more than one bribe or extortion, increase by 2 levels."). The application notes further state:

> Related payments that, in essence, constitute a single incident of bribery or extortion (e.g., *a number of installment payments for a single action*) are to be treated as a single bribe or extortion, even if charged in separate counts.

> In a case involving more than one incident of bribery or extortion, the applicable amounts under subsection (b)(2) (i.e., the greatest of the value of the payment, the benefit received or to be received, the value of anything obtained or to be obtained by a public official or others acting with a public official, or the loss to the government) are determined separately for each incident and then added together.

App. n.2, USSG 2C1.1 (emphasis added). A "payment" is defined as "anything of value" and "needs not be monetary." App. n.1, USSG 2C1.1. A "payment" is different than an "incident of bribery."

The Government's statement of facts supports a conclusion that Mr. Arevalo received "a number of installment payments for a single action." App. n.2, USSG 2C1.1. First, Mr. Arevalo did not plead guilty to honest services fraud or bribery; he pleaded guilty to conspiracy to commit those acts, which does not require the actual commission of "an official act," as would be required by the substantive offense. *See* 18 U.S.C.

201(a)(3) ("any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit.").  In this way, Mr. Arevalo's receipt of the 31 payments are simply overt acts of the conspiracy.

Second, although the Statement of Facts "does not include each and every fact known to … the United States,"[2] the Government only describes one potential[3] incident of bribery related to "seeking a contract vehicle to obtain contract awards associated with HAF/A2I's technology initiative and associated projects."  Statement of Facts (SOF), ¶ 14.  Mr. Arevalo's actions, as described by the Government in paragraphs 17 through 30, are all related to obtaining the same contract vehicle and took place over a period of approximately seven days (10/28/2023 to 11/5/2023).  SOF, ¶¶ 17-30.  Moreover, all of his actions related to the HAF/A2I's technology initiative occurred before Mr. Arevalo began receiving payments via his family member, which did not start until January 27, 2014.  The remainder of the statement of facts describes general actions of the conspiracy but nothing that could be considered "an incident of bribery."  SOF, ¶¶ 31-38.  The Statement of Facts certainly does not describe 31 separate incidents of bribery,

---

[2] Statement of Facts, ¶ 39.

[3] It is doubtful that any of Mr. Arevalo's direct communications with Sotomayor or Person B would be considered "official acts."  See SOF, ¶¶ 17-30.  While he worked for the Air Force, Mr. Arevalo was at all times himself a contractor and never held the position of a contracting officer, one who makes decisions on contracts.  Therefore, although his communications with Sotomayor and Person B perhaps included advice or inside information, those communications would not have been a "decision or action on any question, matter, cause, suit, proceeding or controversy … in [Mr. Arevalo]'s official capacity."

which would be required under the applications notes to Guidelines 2C1.1.  App. n.2, USSG 2C1.1 ("In a case involving more than one incident of bribery or extortion, the applicable amounts under subsection (b)(2) … are determined separately for each incident.").

Finally, the Statement of Facts also describes these payments as a "retainer," which implies a deposit for future services.  *See* SOF, ¶ 13 ("[a]lso in exchange for these payments, AREVALO was placed on retainer[.]").  Again, Mr. Arevalo's family member began receiving these payments on January 27, 2014.  The Government describes no substantive actions taken by Mr. Arevalo after that date that could be considered an "incident of bribery," which requires Mr. Arevalo to perform an official act.  Granted, Mr. Arevalo received many "payments," but Guideline 2C1.1(b)(1) is not scored simply for separate "payments" without a separate incidence of bribery.

## ARGUMENT ON SENTENCING FACTORS

Since the Guidelines were held to be advisory in *United States v. Booker*, 543 U.S. 220, 226 (2005), imposing a sentence is no longer a strictly mathematical exercise. While "a district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines," *United States v. Hughes*, 401 F.3d 540, 546 (4th. Cir. 2005), district courts must now make "an individualized assessment based on the facts presented" after calculating the advisory Guidelines range.  *Gall v. United States*, 552 U.S. 38, 50 (2007).

The Guidelines range is but one of several factors a court must consider when imposing a sentence and it is legal error to treat those ranges as default sentences.  *See*

*United States v. Mendoza-Mendoza*, 597 F.3d 212, 216-17 (4th Cir. 2010); *Nelson v. United States*, 555 U.S. 350, 352 (2009) (per curiam); *Spears v. United States*, 555 U.S. 261, 263-64 (2009).  A court must also weigh the factors enumerated in 18 U.S.C. § 3553(a) when imposing a sentence.

When considering the factors enumerated in § 3553(a), which state that a judge must "'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing," *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (quoting 18 U.S.C. § 3553(a)), courts are not required to point to "'extraordinary' circumstances to justify a sentence outside the Guideline range." *Gall v. United States*, 552 U.S. 38, 47 (2007).  A below-Guidelines sentence may be appropriate if the Court determines that the Guideline sentence "falls outside the 'heartland' to which the Commission intends individual Guidelines to apply, perhaps because the Guidelines . . . fails to properly reflect § 3553(a) factors." *Rita v. United States*, 551 U.S. 338, 351 (2007)(citation omitted).

The factors for the district court to consider include:  (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed; (3) the kinds of sentences available; (4) the Sentencing Guidelines; (5) pertinent policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted disparities among similar offenders; and (7) the need to provide restitution to victims.  18 U.S.C. § 3553(a).  The Court must weigh each of these factors when determining the appropriate sentence with the least amount of imprisonment necessary pursuant to § 3553(a). *Id*.

**The Nature and Circumstances of the Offenses**

In the summer of 2013, Congress foreshadowed the possibility of a government shutdown as our political parties squabbled over the implementation of the Affordable Care Act.  Sure enough, on October 1, 2013, the federal government shutdown for 17 days for lack of an appropriations bill.  On October 17, 2013, the President signed the Continuing Appropriations Act of 2014,[4] which included a continuing resolution to fund the government until January 15, 2014 and suspended the U.S. debt ceiling until February 7, 2014.  During much of the six-month period from October 2013 to March 2014, Mr. Arevalo was not getting paid.  He significantly depleted his savings to pay household bills and support his family.  Those saving began to run dry around the beginning of January 2014 and it was at this time that Julio "Jace" Sotomayor (Sotomayor) offered "to help."

Mr. Arevalo met Sotomayor when he first began working at the Pentagon when he was 23 years old.  Sotomayor was a mentor to Mr. Arevalo in every possibly way.  He taught Mr. Arevalo about the military (including its unique terminology), the DoD, and the inner workings of the Pentagon work environment.  They worked together closely for almost ten years.  Mr. Arevalo was impressed by Sotomayor's military accomplishments, his natural leadership ability, and drawn in by his infectious and charismatic nature.  Likewise, Sotomayor recognized that Mr. Arevalo had a particular brilliance for

---

[4] Continuing Appropriations Act of 2014, Public Law 113-46 (Oct. 17, 2013), available at https://www.congress.gov/113/plaws/publ46/PLAW-113publ46.pdf (last accessed 12/8/2023).

technological innovation.  Sotomayor viewed Mr. Arevalo as an asset.

Sotomayor eventually became like an older brother to Mr. Arevalo.  They worked together every day so they eventually began spending social time together as well.  They would often speak about personal and family issues.  On one occasion early in Mr. Arevalo's career, Sotomayor gave him money to fix a water leak in his home when he was short on money.  They even went Christmas shopping together on a few occasions. Sotomayor always seemed to be there to take care of Mr. Arevalo, which created a tremendous sense of loyalty to Sotomayor.

Their closeness also allowed Mr. Arevalo to see another side of Sotomayor.  At times, Sotomayor was very insecure about the business maneuvers of other contractors. Sotomayor could also be vindictive, manipulative, and pushy.  Sometime shortly after Sotomayor began making payments to Mr. Arevalo's family member, he told Mr. Arevalo that "[Arevalo] needed to figure out where his loyalties were."  Indeed, Mr. Arevalo did feel very loyal to Sotomayor.  Sotomayor was Mr. Arevalo's de facto support system towards the end of 2013.  Mr. Arevalo's wife seemed to be struggling heavily with clinical depression.  Mr. Arevalo's wife had recently lost her job and was forced to resign. His wife went through time periods where she wouldn't get dressed or leave the house. She also stopped grocery shopping or doing other household chores.  In addition to her own struggles, his wife forced Mr. Arevalo to largely cut off contact with his own parents or his surrogate mother, Judy Cary, because of disputes.

All of this to state, at the time this conspiracy began, Mr. Arevalo was in a very vulnerable place.  When he first assisted Sotomayor with finding a contract vehicle for

HAF/A2I's technology initiative during October/November 2013, he did it primarily out of loyalty to Sotomayor based on their relationship as a whole and to try to keep people in his department employed.  It was two and a half months later that Mr. Arevalo first began accepting money from Sotomayor.

<u>**Personal History and Characteristics**</u>

Mr. Arevalo was born in San Francisco, California to Filipino immigrants in 1979. His parents left the Philippines after President Ferdinand Marcos came to power.  "The nine-year military rule ordered by then President Ferdinand Marcos in 1972 unleashed a wave of crimes under international law and grave human rights violations, including tens of thousands of people arbitrarily arrested and detained, and thousands of others tortured, forcibly disappeared, and killed."[5]  They lived in California for a short time but they eventually settled in the Washington, D.C. area.  His parents opened and operated a small business and fashion company in 1986 called Georgetown&co (the logo appears on the letter from Mr. Arevalo's father).

His parents owning a fashion company led to an eccentric childhood.  Mr. Arevalo's mother and father traveled constantly to fashion merchandise trade shows and to other locations to find buyers for their fashion goods.  This meant Mr. Arevalo and his sister would also travel the world from a very young age.  There were trips to the Caribbean to sell goods, trips to Asia, and sometimes to New Jersey for the Miss America

[5] Amnesty International, *Five Things to Know About Martial Law in the Philippines*, Apr. 25, 2022, available at https://www.amnesty.org/en/latest/news/2022/04/five-things-to-know-about-martial-law-in-the-philippines/#:~:text=During%20the%20martial%20law%20era,were%20critical%20of%20the%20government (last accessed 12/8/2023).

Pageant.  Georgetown&co had been "exhibiting and selling [its] accessories, and dresses to Miss America participants and supporters since 1990.  They [were] pioneers [] in [the] Miss America trade show."[6]  In 2014, a Filipino newspaper described their company as "Filipino-American owned Georgetown&Co is a U.S. Congressional awardee and upscale women accessory group serving the Capitol Hill and the diplomatic community since 1987 in Washington, DC and has expanded in New Jersey, Pennsylvania and Delaware."[7]  Mr. Arevalo's parents are still very fashionable:



In some other ways, Mr. Arevalo's childhood was very normal.  The family had a nice home in northern Virginia.  Mr. Arevalo felt he had a good upbringing.  Mr. Arevalo had friends, was involved in sports, and went to school every day, although he was good

---

[6] Bourbon, C., *Fil-Am Fashion Enterprise Is a pioneer exhibitor at Miss America pageant week*, Philippine Daily Mirror (Sep. 19, 2014), available at https://www.philippinedailymirror.com/fil-fashion-enterprise-pioneer-exhibitor-miss-america-pageant-week/ (last accessed 12/8/2023).
[7] *Id.*

at boxing and bad at school.  When he was young, his grandfather lived with them and Mr. Arevalo assisted as being his caregiver.  The family integrated into American culture and celebrated typical holidays like Christmas:






Times were not always great though.  One particularly traumatic incident for Mr.

Arevalo was when his grandfather died.  While his grandfather lived with them, Mr. Arevalo found him one day as he was choking on his food.  This was when his grandfather was quite elderly.  Mr. Arevalo had not been in the room with his grandfather and did not know he was eating.   Because his grandfather was unconscious and did not appear to be breathing, Mr. Arevalo attempted to give him CPR, which only further forced food down his throat.  After medical personnel later told them the cause of death, Mr. Arevalo struggled with extreme guilt and depression over his actions.

Additionally, over the years, the family lost several homes because of the ups and downs in his parents' business.  One instance occurred in approximately 1994 when Mr. Arevalo was around 15 years old.  The family decided to relocate to New Jersey to get back on their feet.  Mr. Arevalo began to feel like he was a burden to the family.  In an unusual situation, Mr. Arevalo decided to stay in northern Virginia and was technically homeless for a short time.  He eventually found his way to living with Ms. Judy Cary, the mother of a girl he dated in high school.



Ms. Cary became like a surrogate mother to Mr. Arevalo and helped him through the later of half of high school in Haymarket, Virginia.  He was well-liked in high school, becoming the president of the international club, planning trips for the student body, and even becoming a finalist for homecoming king.  However, Mr. Arevalo was still struggling badly in high school in areas like English, though he excelled in math.  It was Ms. Cary that first suspected Mr. Arevalo might be dyslexic, before he was eventually diagnosed at 19 years old.  Because of that late diagnosis, Mr. Arevalo finished high school at the Bryant Alternative High School at the age of 21.

As a teenager, Mr. Arevalo always had the ability to intensely commit to activities that interested him, like running, snowboarding, or boxing (all of which he excelled at).  On top of that, Mr. Arevalo undoubtedly developed his work ethic from the experience of losing his personal belongings and homes and never wanting that experience to happen to his family.  He was also influenced from being around his parents as a young boy.  Mr. Arevalo had an entrepreneurial spirit and creativeness.  He was able to see first-hand what one can accomplish with a strong work ethic.  He worked steadily throughout high school to contribute to Ms. Cary's household expenses.  After high school, Mr. Arevalo tried his hand at several small businesses.  He was involved with a restaurant in Washington, D.C. and also had a marketing business for direct savings with the local restaurant industry.  Mr. Arevalo took some college courses at Northern Virginia Community College, George Mason University, and Georgetown, but never obtained a degree.  Ironically, he would later lecture at Stanford and MIT after several important inventions at the Pentagon.

Mr. Arevalo made it to the Pentagon in 2003.  He was first in charge of technical support for the Pentagon briefing room.  Then, he moved to technical support for VIP's and special projects.  Next, he managed all smart phone servers for GS-15 and above personnel, which encompassed about 25,000 blackberries.  He also worked for a short time with the Office of Secretary of Defense.  Eventually, he arrived at the Q group in Headquarters Air Force where he worked on high tech innovations.  There, Mr. Arevalo really found his niche.  As stated by Mr. Ken Johns in his letter, Mr. Arevalo is "probably a genius" and "he has a unique ability to envision and engineer complex solutions to technical problems."

During his time at Q group, their mission was "to rapidly devise, develop and deploy combat capability to deployed U.S. and Allied forces in Iraq and Afghanistan" focusing on "providing situation awareness and protection through advanced connectivity to dispersed forces, using unmanned vehicle video, commercial imagery, and other electronic means."[8]  Essentially, they were developing technology that would allow our troops to instantly see the location of friendly personnel and instantly get video/images from other locations.  Mr. Arevalo was passionate about this work.  He often worked very long hours and this was generally known.  On one occasion, he worked for 72 hours straight, even completing the work of others, to meet a project deadline.

First, Mr. Arevalo worked on developing the necessary data architecture for the

---

[8] Letter of Kenneth J. Johns.

system (RAIN) and then worked on developing the applications that could provide the necessary information (ACID). However, their most highly acclaimed success was ATAK, which Mr. Arevalo co-created. ATAK is essentially a handheld device that runs all the applications and can be conveniently carried by military, first responders, or law enforcement. It has been called Wi-Fi for the battlefield. That program earned their team the 2016 Excellence in Engineering Award and the 2018 Excellence in Technology Transfer Award. Because counsel's description will not do ATAK justice, counsel intends to play an informational video at the sentencing hearing published by the Department of Homeland Security illustrating the program.[9]

ATAK has been used to save lives in all types of situations. It has been used to assist law enforcement and first responders during Hurricane Harvey in 2017 and again for Hurricane Irma in Florida and Hurricane Maria in Puerto Rico.[10] According to Mr. Johns' letter of support, ATAK was also used to apprehend the Boston Bomber and has been used by firefighters, the Coast Guard, and other first responders to rescue over 2,000 people. Although hard to find published articles, it likely has saved countless lives within our military as well. "ATAK is currently in use by over 40,000 DoD, DHS, and military users; 32,000 nonfederal users; and 100 commercial licensees."[11] As such, Mr.

---

[9] The video can be found on the DHS website here:
https://www.dhs.gov/medialibrary/assets/videos/22957 (last accessed 12/8/2023).
[10] Department of Homeland Security, *ATAK increases situational awareness, communication and alters understanding of actions across agencies* (Nov. 17, 2017), available at https://www.dhs.gov/science-and-technology/news/2017/11/17/snapshot-atak-increases-situational-awareness-communication (last accessed 12/8/2023).
[11] The Air Force Research Laboratory, available at
https://afresearchlab.com/technology/information-technology/tactical-assault-kit-tak/ (last accessed 12/8/2023).

Arevalo's innovation is alive and well.

Eventually, the Q group was dismantled and other contracting opportunities dried up around approximately 2019.  Mr. Arevalo left his employment at the Pentagon to start other business ventures, none of which were very successful.  Currently, Ms. Cary lives in Woodbridge, Virginia and Mr. Arevalo's parents and older sister live in Martinsville, Virginia.  Mr. Arevalo's parents are in very poor health physically; his father has stage 4 chronic kidney disease and his mother has stage I breast cancer.  Mr. Arevalo's father rightly fears that he will never again share a "10-minute embrace" before he and his wife "close their eyes."

### The Need for the Sentence Imposed

Mr. Arevalo has never served a sentence of confinement before, though he is currently in state custody.  Pursuant to the sentencing statute, a defendant's sentence should be designed:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. § 3553(a)(2).  A felony conviction and a sentence of probation will certainly reflect the seriousness of his offense.  Moreover, it will deter others and protect the public from bribery and honest services fraud.  With respect to specific deterrence, Mr. Arevalo will express to this Court the remorse and embarrassment he feels and what he has learned from this event.

Additionally, as the Second Circuit noted, a defendant who has previously been

sentenced to minimal incarceration, might very well be deterred by a lesser amount of incarceration than someone who has shown themselves to be undeterred by a lengthy sentence. *See United States of America v. Mishoe*, 241 F.3d 214, 220 (2d Cir. 2001). Mr. Arevalo's has never before been sentenced to a term of confinement. Therefore, even a very small amount of confinement would carry enough deterrence, although probation is more appropriate in this case.

A probationary sentence here would recognize Mr. Arevalo's respect for the law and provide a just punishment. Indeed, "[p]robation is not an act of leniency. Probation is a substantial restriction of freedom; it is not forgiveness, and it is not an endorsement of the offense." *United States v. Myers*, 353 F. Supp. 2d 1026, 1032 (S.D. Iowa 2005) (citation omitted). The fact that Mr. Arevalo is seeking a probationary sentence does not mean that he is seeking to be absolved of punishment as it is "[i]nherent in the very nature of probation [] that probationers do not enjoy the absolute liberty to which every citizen is entitled." *United States v. Knights*, 534 U.S. 112, 119 (2001) (citations and internal quotations omitted); *See also Gall v. United States*, 552 U.S. 38, 48 n.4 (2007); ("Probation is not granted out of a spirit of leniency. . . . As the Wickersham Commission said, probation is not merely 'letting an offender off easily'") (citing Advisory Council of Judges of National Council on Crime and Delinquency, *Guides for Sentencing* 13-14 (1957).

The research shows that lengthier prison sentences do not prevent recidivism. "[H]aving pulled together the best available evidence, we have been persuaded that prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen et

17

al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).  "Among low-risk offenders, those who spent less time in prison were 4% less likely to recidivate than low-risk offenders who served longer sentences.  Thus, when prison sentences are relatively short, offenders are more likely to maintain their ties to family, employers, and their community, all of which promote successful reentry into society.  Conversely, when prisoners serve longer sentences, they are more likely to become institutionalized, lose pro-social contacts in the community, and become removed from legitimate opportunities, all of which promote recidivism."  Valerie Wright, *Sentencing Project, Deterrence in Criminal Justice: Evaluating Certainty v. Severity of Punishment* (2010).[12]

Even the Sentencing Commission itself acknowledged this fact.  "There is no correlation between recidivism and guidelines' offense level.  Whether an offender has a low or high guideline offense level, recidivism rates are similar." U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 15 (2004).  And perhaps most notably, the Department of Justice has tacitly acknowledged this fact:  "[C]onfinement or increased length of incarceration served the crime control purpose of incapacitation but had little or no effect as a 'treatment' with rehabilitative or specific deterrent effects."  Don M. Gottfredson, U.S. Department of Justice, National Institute of Justice, *Effects of Judges' Sentencing Decisions on Criminal Cases*, Research in Brief 9 (Nov. 1999).

---

[12] Available at https://webpage.pace.edu/jhumbach/Crim-SentencingProject%20ReportonDeterrence.pdf (last accessed March 8, 2023).

In accordance with § 3353(a), a sentence of probation is sufficient, but not greater than necessary, to reflect the seriousness of the case and achieve the Court's goals of specific and general deterrence.

### The Kinds of Sentences Available

Although not recommend by the Guidelines, probation is authorized under the statute of conviction in this matter.  PSR, ¶ 119, p. 21.  Additionally, because of Mr. Arevalo's anticipated state sentence in Prince William County, the Court is authorized to order the sentence be run concurrent with any anticipated state sentence.  *United States v. Setser*, 566 U.S. 231, 236-45 (2012); *see also* 18 U.S.C. § 3584(a).  The Government has briefed this issue sufficiently.  However, the Government misstates that "the state offense must constitute relevant conduct to the instant offense of conviction" to be run concurrently.  ECF 14 at 12.  In fact, even if not relevant conduct, "the sentence for the instant offense may be imposed to run concurrently, partially concurrently, or consecutively to the prior undischarged term of imprisonment to achieve a reasonable punishment for the instant offense."  USSG 5G1.3(d).

The application notes further explain:  "[u]nder subsection (d), the court may impose a sentence concurrently, partially concurrently, or consecutively to the undischarged term of imprisonment.  In order to achieve a reasonable incremental punishment for the instant offense and avoid unwarranted disparity, the court should consider the following:

> (i) the factors set forth in 18 U.S.C. § 3584 (referencing 18 U.S.C. § 3553(a));
> (ii) the type (e.g., determinate, indeterminate/parolable) and length of the prior undischarged sentence;
> (iii) the time served on the undischarged sentence and the time likely to be

served before release;

(iv) the fact that the prior undischarged sentence may have been imposed in state court rather than federal court, or at a different time before the same or different federal court; and

(v) any other circumstance relevant to the determination of an appropriate sentence for the instant offense."

App. n.4(a), USSG 5G1.3.

Mr. Arevalo faces a lengthy sentence in state court with Guidelines beginning around 13 years. By the time he finishes his state sentence, he would start serving his federal sentence approximately 15-20 years after the heart of his misconduct in this case. Mr. Arevalo's remorse and acceptance of responsibility, and his life-saving contributions to military, law enforcement, and first responders, weigh heavily in favor of a concurrent sentence in this matter, if the Court feels active incarceration is appropriate.

## The Sentencing Guidelines & Pertinent Policy Statements

The Sentencing Guidelines range should be viewed critically against Mr. Arevalo's actual conduct. After considering the actual harm done and Mr. Arevalo's admitted conduct, a downward variance in this case is warranted. Should the Court sustain Mr. Arevalo's objection to the guidelines calculation, his sentencing range would be between 30 and 37 months. This is still an inflated level for the nature of his offense. A much lower sentence is appropriate considering all of the sentencing factors in § 3553(a).

In that regard, the U.S. Sentencing Commission and Congress have made substantial amendments to portions of the Guidelines applicable to Mr. Arevalo's case.[13]

---

[13] Counsel raises the recent U.S.S.G. Amendments in furtherance of Mr. Arevalo's argument for a variant sentence. Indeed, given that the Sentencing Commission has seen fit to change how the guidelines apply to individuals with no criminal history points (such as Arevalo) through new § 4C1.1 and § 5C1.1 App. n.10(B)—explicitly making the

*See* U.S.S.G §1B1.11(a) ("[t]he court *shall* use the Guidelines Manual in effect on the date that the defendant is sentenced[]") (emphasis added).  First, the Commission added new Guideline section 4C1.1, under Chapter 4—Criminal History, which provides for the *decrease* of two offense levels if the defendant meets all of the required criteria.  U.S. SENT'G COMM'N, Amendments to the Sentencing Guidelines—Preliminary, pg. 72 (April 5, 2023)[14]; *see also* U.S. SENT'G COMM'N, Amendments to the Sentencing Guidelines, Retroactive Application, pp. 1-2 (Aug. 31, 2023) (explaining that the effective date of §4C1.1 was Nov. 1, 2023, because "the policy reasons underlying []the amendments apply with equal force to individuals who are already sentenced;" while also stating that the amendments to the Guidelines recognize the fact that "*individuals with zero criminal history points have considerably lower recidivism rates than other sentenced individuals*") (emphasis added).[15]

Indeed, underpinning its rationale for drafting §4C1.1, the Sentencing Commission stated that "[r]ecidivism data analyzed by the Commission suggest that offenders with zero criminal history points ("zero-point" offenders) have considerably lower recidivism rates than other offenders, including lower recidivism rates than the offenders in Criminal History Category I with one criminal history point." U.S. SENT'G COMM'N, Amendments to the Sentencing Guidelines—Preliminary, pg. 71-72 (April 5,

---

recommended Guidelines Sentences for this class of individuals more lenient across the board—the requested variant sentence in Mr. Arevalo's case is all the more warranted.
[14] Available at: https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20230405_prelim-RF.pdf.
[15] Available at: https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202308_RF-retro.pdf.

2023).[16]

Moreover, in addition to the changes in Chapter 4, the Commission also added new Application Note 10(B) to §5C1.1 (Imposition of a Term of Imprisonment) addressing "nonviolent first offenders" such as Mr. Arevalo.  *See* U.S. SENT'G COMM'N, Amendments to the Sentencing Guidelines, pg. 82 (April 27, 2023).[17] Specifically, the new application note provides:

> "that a departure, including a departure *to a sentence other than a sentence of imprisonment*, may be appropriate if the offender received an adjustment under new §4C1.1 and the applicable guideline range overstates the gravity of the offense because the offense of conviction is not a crime of violence or an otherwise serious offense."

*Id.*  (emphasis added).

### The Need to Avoid Unwanted Disparities & Provide Restitution

As the Government rightly points out, Mr. Arevalo is far less culpable than Sotomayor, who received a sentence which includes 6 months of active incarceration. ECF No. 14 at 10.  The Government attributes this to Sotomayor's "multiple schemes." However, Sotomayor also manipulated and used his relationship with Mr. Arevalo to his advantage.  He took advantage of Mr. Arevalo's loyalty, which is another reason he is much more culpable.  In fact, Mr. Arevalo is not mentioned once in Sotomayor's 21-page indictment.  ECF No. 1, 1:22-cr-00122-RDA.  Mr. Arevalo is mentioned only once in Sotomayor's Statement of Facts under a section entitled "Other Relevant Conduct."  ECF

---

[16] Available at: https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20230405_prelim-RF.pdf.

[17] Available at: https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202305_RF.pdf.

No. 34, ¶ 75, 1:22-cr-00122-RDA.  In other words, Sotomayor engaged in so much more misconduct than Mr. Arevalo that Mr. Arevalo was simply a footnote in Sotomayor's case.

The government implies that Mr. Arevalo had something to do with the 51.6 million dollars that Sotomayor's companies obtained.  ECF No. 14 at 8.  However, the bulk of this money was obtained through Sotomayor's illegal actions with Diane Sturgis.  Mr. Arevalo's actions, as described by the Government, related to one contract vehicle over 7 days in October and November of 2013.  Importantly, the contact was performed as requested, i.e., they did the work.  The Government is not seeking any restitution from Mr. Arevalo.  He simply stands nowhere near Sotomayor in terms of his culpability.

<u>**CONCLUSION**</u>

Mr. Arevalo respectfully requests that the Court impose a variant sentence of probation, or alternatively order that his federal sentence run concurrently with his anticipated state sentence.

Respectfully submitted,
JUAN CARLOS AREVALO, III
By Counsel

_____/s/_____
Yancey Ellis (VSB 70970)
Counsel for Defendant
108 N. Alfred Street, First Floor
Alexandria, Virginia 22314
703.684.7908
yancey@carmichaellegal.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 8, 2023, I filed the foregoing pleading through the ECF system, which shall then send an electronic copy of this pleading to all parties in this action.

_____/s/_____
Yancey Ellis